**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| COMMUNITY FOR PERMANENT SUPPORTED HOUSING, CYNTHIA CURTIS, MARY HUBBARD, IRENE NIEMOTKA, MARGARET ("PEGGY") SHADDUCK, and KELLY WATERMAN,<br><br>Plaintiffs,<br><br>v.<br><br>HOUSING AUTHORITY OF THE CITY OF DALLAS, TEXAS,<br><br>Defendant. | Case No. 3:18-cv-2030-K |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S <u>MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................ 1

STATEMENT OF FACTS ........................................................ 3

ARGUMENT ........................................................ 8

A. Plaintiffs Have Standing. ........................................................ 9

B. Plaintiffs Allege Facts That State a Claim Under Multiple Theories. ........................................................ 16

CONCLUSION ........................................................ 23

CERTIFICATE OF SERVICE ........................................................ 24

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Civil Rights Union v. Martinez-Rivera*,
166 F. Supp. 3d 779 (W.D. Tex. 2015)....14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....9

*Avalon Residential Care Homes, Inc. v. City of Dallas*,
No. 3:11-CV-1239-D, 2011 WL 4359940 (N.D. Tex. Sept. 19, 2011)....15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 540 (2007)....9

*CC Distribs., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989)....12

*Chadam v. Palo Alto Unified Sch. Dist.*,
666 F. App'x 615 (9th Cir. 2016)....16

*Chavez v. Aber*, 122 F. Supp. 3d 581
(W.D. Tex. 2015)....9, 10, 12, 17

*Doe v. Cty. of Centre, PA*,
242 F.3d 437 (3d Cir. 2001)....9

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*,
729 F. App'x 287 (5th Cir. 2018)....11

*Falls v. Bd. of Comm'rs of New Orleans Reg'l Transit Auth.*,
No. CV 16-2499, 2017 WL 2730781 (E.D. La. June 26, 2017)....16, 21

*Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*,
806 F.3d 363 (5th Cir. 2015)....15

*Frame v. City of Arlington*,
657 F.3d 215 (5th Cir. 2011)....16

*Freyre v. Hillsborough Cty. Sheriff's Office*,
No. 8:13-CV-02873-T-27, 2014 WL 6885913 (M.D. Fla. Dec. 5, 2014)....11

*Green v. Hous. Auth. of Clackamas Cty.*,
994 F. Supp. 1253 (D. Or. 1998)....17

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011)....18

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)....................................................................................................13

*Hollis v. Chestnut Bend Homeowners Ass'n*,
760 F.3d 531 (6th Cir. 2014) ...................................................................................9, 10

*Hooker v. Dallas Indep. Sch. Dist.*,
No. 3:09-cv-1289-D, 2010 WL 4025877 (N.D. Tex. Oct. 13, 2010) ...............................11, 18

*Huyn v. Sanchez*,
No. 5:14-cv-02367 LHK, 2014 WL 4364846 (N.D. Cal. Sept. 2, 2014)...........................17, 19

*Inclusive Cmtys. Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*,
860 F. Supp. 2d 312 (N.D. Tex. 2012) .............................................................................20

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
892 F.3d 719 (5th Cir. 2018) ........................................................................................8, 9

*Jordan v. Greater Dayton Premier Mgmt.*,
9 F. Supp. 3d 847 (S.D. Ohio 2014) ...............................................................................16

*Meadowbriar Home for Children, Inc. v. Gunn*,
81 F.3d 521 (5th Cir. 1996) ..........................................................................................10

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
768 F.3d 1135 (11th Cir. 2014) ......................................................................................10

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ....................................................................................13, 14

*Ores v. Willow West Condo. Ass'n*,
No. 94 C 4717, 1996 WL 111894 (N.D. Ill. Mar. 12, 1996) ...............................................12

*Richardson v. Axion Logistics, L.L.C.*,
780 F.3d 304 (5th Cir. 2015) ...........................................................................................8

*Rideau v. Keller Indep. Sch. Dist.*,
819 F.3d 155 (5th Cir. 2016) .........................................................................................12

*Shaikh v. Texas A&M Univ. Coll. of Med.*,
No. 16-20793, 2018 WL 3090415 (5th Cir. June 20, 2018)...............................................20

*Steward v. Abbott*,
189 F. Supp. 3d 620 (W.D. Tex. 2016)......................................................................14, 20

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
785 F.3d 719 (D.C. Cir. 2015) ........................................................................................12

*Van Velzor v. City of Burleson*,
43 F. Supp. 3d 746 (N.D. Tex. 2014) ..............................................................................16

*Wooten v. McDonald Transit Assocs.*,
788 F.3d 490 (5th Cir. 2015) ...........................................................................................9

**Statutes**

24 C.F.R. § 8.33 ...........................................................................................................17

24 C.F.R. § 983.251(a)(4)............................................................................................4, 22

28 C.F.R. § 35.130(b)(7).....................................................................................................17

29 U.S.C. § 794a(a)(2).......................................................................................................10

42 U.S.C. § 3604(f)(3)(B)...........................................................................................17, 20

42 U.S.C. § 3613(a)(1)(A) .................................................................................................10

42 U.S.C. § 12133..............................................................................................................10

42 U.S.C. § 12182(b)(1)(E) ...............................................................................................10

## INTRODUCTION

Plaintiffs respectfully submit this memorandum of law in opposition to Defendant Housing Authority of the City of Dallas, Texas ("DHA")'s Motion to Dismiss (Doc. 19) ("DHA Br.").

This lawsuit challenges a DHA policy that excludes adults with intellectual and developmental disabilities ("I/DDs") and their families from the affordable housing opportunities that DHA offers others. People who have I/DDs, such as Down syndrome or pervasive developmental disorder, have significant limitations in their intelligence and/or adaptive behavior. But they can live with substantial independence, and greatly benefit from it, so long as their living environment is properly tailored to provide them with needed supports. At issue in this suit is a DHA policy that prevents Plaintiffs from providing adults with I/DDs such supports within DHA's project-based voucher ("PBV") program.

Like the more common Section 8 tenant-based vouchers, PBVs subsidize rental housing for people with limited income, but unlike tenant-based vouchers, PBVs attach to specific properties. Plaintiffs want to use the PBV program—and the properties it makes affordable to people who, like most adults with I/DDs, have limited income—to create affordable and stable opportunities for adults with I/DDs to live independently. DHA has stymied their efforts by strictly enforcing its rule that property owners may not rent their PBV-subsidized properties to family members. It refuses to relax that rule for adults with I/DDs, even though permitting family members more control over the living environment than is possible within the context of an arm's-length landlord-tenant relationship is necessary to accommodate their needs and permit them to share in the PBV program's benefits.

At the urging of Plaintiff Community for Permanent Supportive Housing ("CPSH"),

DHA in 2016 finally took steps toward including adults with I/DDs in its affordable housing offerings by issuing a request for proposals for PBVs geared for their needs. But then, after a change in leadership, DHA reversed course and canceled that RFP rather than permit those adults to rent from their families. It told CPSH it would not make this accommodation in *any* of its PBV offerings. The only reason DHA has given for this refusal is an incorrect statement that HUD rules preclude it from offering this accommodation—though HUD rules expressly *permit* such an accommodation, and HUD has told DHA that its rules pose no barrier. DHA thus chooses to maintain a policy that excludes adults with I/DDs from the affordable, independent housing opportunities they desperately need, without providing a legitimate rationale for doing so. To remedy this disability discrimination, CPSH and the Individual Plaintiffs brought this action under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fair Housing Act, and the Texas Fair Housing Act.

DHA now moves to dismiss, but its arguments are based on a misreading of the Complaint (Doc. 1) as well as the relevant law. DHA incorrectly construes the Complaint as seeking a reinstatement of the specific 2016 RFP that it began and then cancelled. *See* DHA Br. at 2-4. In fact, this is a challenge to DHA's broader refusal to accommodate the needs of people with I/DDs. DHA repeatedly asserts that the Complaint makes only conclusory allegations regarding its policy's discriminatory effect, but the Complaint spells out in detail how its policy prevents family members from creating the supportive, stable, and enduring living environments that people with I/DDs need and thus excludes people with I/DDs from the benefits of its PBV program and from needed housing. The Complaint thus states a claim under each of the laws it invokes.

DHA also errs in contending that Plaintiffs lack standing. Because of DHA's policy,

parents of adults with I/DDs, such as the Individual Plaintiffs here, cannot use the PBV program to create housing opportunities that are tailored to provide the supports their adult children need to live full lives independently and that can be structured as trusts to provide for their children in perpetuity. That causes them concrete injury now—both financially and emotionally—that will only get worse going forward, as aging parents become infirm or die without being able to create stable living environments for their children that will outlive them. It also concretely injures CPSH, which is devoted to creating better living opportunities for people with I/DDs and has been stymied by DHA's discriminatory policy from accomplishing its mission.

DHA makes a variety of other arguments, with respect to Plaintiffs' standing and the merits of their claims, but all are meritless. This Court should deny DHA's Motion.

**STATEMENT OF FACTS**

The following facts from the Complaint, which must be taken as true for purposes of this Motion, are greatly summarized; the Complaint describes them in more detail.

More than 100,000 adults with I/DDs live in northern Texas. Complaint ¶¶ 3, 38 (hereinafter "Compl."). People with I/DDs have significant limitations in intelligence and/or adaptive behavior. Nonetheless, they often are capable of living with considerable independence given sufficient support. Such independence contributes greatly to their physical and emotional well-being, including by providing increased opportunities for socialization and wider community integration. *Id.* ¶¶ 38, 40. Research suggests that, when adults with I/DDs can live in their own homes with appropriate supports, they are less lonely, healthier, financially better off, and more satisfied with their lives. *Id.* ¶ 44.

Rather than attaining such independence, most people with I/DDs continue to live with their families well into adulthood, even as their parents age and their need for independence

increases. Compl. ¶¶ 3, 39. This deprives them of social and other developmental opportunities and puts them at risk of eventual institutionalization or homelessness once their parents no longer can care for them. *Id.* ¶¶ 40-41. The Individual Plaintiffs in this case have adult children in just this situation: these adults with I/DDs continue to live with their parents though it is not the best arrangement for their short- or long-term interests. *Id.* ¶¶ 71-112. The Individual Plaintiffs do not want that situation to continue, but very few suitable and affordable housing options exist for adults with I/DDs to live more independently. *Id.* ¶¶ 43-45.

DHA contributes to this problem by excluding adults with I/DDs from the benefits of its program that is best suited to their needs. DHA is a public housing authority ("PHA") that offers a variety of programs to assist area families in securing affordable and appropriate housing. Compl. ¶¶ 5, 26. One of them is the PBV program, which subsidizes the rental of voucher-supported properties to people who meet eligibility criteria such as having low income. *Id.* ¶¶ 2, 48. PHAs use PBV offerings to target specific populations with a significant need for affordable housing, such as people who are homeless or have disabilities. *Id.* ¶ 48. The PBV program is funded by the Department of Housing and Urban Development ("HUD") and is subject to its regulations. A HUD regulation provides that, while owners or operators of PBV-supported properties typically may not rent to family members, a PHA may approve such a tenancy as a reasonable accommodation for disability. 24 C.F.R. § 983.251(a)(4).

As this regulation recognizes, a PBV program that permits parents to rent single-family homes to their adult children with I/DDs is essential to these families' ability to create stable, independent living situations that are appropriate to their children's needs. Parents can choose the location of the homes. They can create a family-like environment by working closely with similarly situated families, matching up long-term roommates who already are or can become

friends. These families can work together to provide the necessary supports, including a live-in caretaker, and need not worry about their children's landlord. And through creation of a trust to own the house, parents can ensure their children's housing will outlive them. Compl. ¶¶ 4, 50-51. None of DHA's other programs permit parents to create and maintain a controlled and supportive but independent housing environment in this manner. *Id.* ¶ 5. The Individual Plaintiffs (like many others) cannot provide these supports, which are necessary for adults with I/DDs to live independently, within the context of the arm's-length landlord-tenant relationship that DHA requires. *Id.* ¶¶ 50-51. Additionally, only through family ownership can families create housing trusts that assure that adult children with I/DDs have secure living arrangements that can outlive aging parents. *Id.* ¶¶ 4, 50.

After extensive work by CPSH to prepare the groundwork, in July 2016, DHA released a request for proposals, called the Neighborhood Housing Program ("2016 Neighborhood Housing RFP"), that could provide up to 50 PBVs for adults with I/DDs to live in just this sort of environment. Compl. ¶¶ 6, 55. As DHA put it, the 2016 Neighborhood Housing RFP was geared toward creating "opportunities for companionship and socialization instead of loneliness; safety and protection against crime; supervision with activities of daily living; and privacy and autonomy within a family lifestyle." *Id.* ¶¶ 7, 55. DHA's announcement included extensive recognition of the benefits of neighborhood-based independent living for adults with I/DDs. *Id.* ¶ 55.

DHA invited applications for PBVs to subsidize the renting of single-family homes to three or more adults with I/DDs, with a live-in aide to provide those residents the support needed to live independently. Compl. ¶ 56. DHA specifically stated in this announcement that it would consider permitting a parent to use such PBVs to rent to a child with an I/DD, thus demonstrating

that it recognized the need for such an arrangement. *Id.* ¶ 8. As expected, most of the proposals that DHA received were from parents of adults with I/DDs looking to rent to their children and others, *i.e.*, applicants who would require the accommodation now at issue here. *Id.* ¶¶ 9, 59. The Individual Plaintiffs either were among those who sought the benefit of the 2016 Neighborhood Housing RFP then (as applicants for a PBV or as participants in a home owned by an applicant) or would have done so imminently had DHA continued the RFP. *Id.* ¶¶ 9, 14. All have adult children who would benefit greatly from the arrangement contemplated by the 2016 Neighborhood Housing RFP and would otherwise qualify to receive such benefits. *Id.* ¶¶ 20-25.

DHA never approved any of the applications. Instead, in April 2017, it cancelled the 2016 Neighborhood Housing RFP, its only offering suitable for the housing and supports needed by many adults with I/DDs. Compl. ¶¶ 10, 60. It stated to Plaintiff CPSH that it took this action because it was not willing to permit a PBV recipient to rent to a family member as an accommodation for the needs of people with disabilities. *Id.* ¶ 11, 61. Thus, it was not simply canceling a particular RFP, but also announcing a broader policy whereby it would not, in any of its offerings, permit the accommodation that Plaintiffs require to participate in DHA's housing programs. *Id.* It did so knowing that its policy would exclude adults with I/DDs and their families from DHA's PBV offerings. *Id.* ¶ 61. And DHA adopted this blanket policy even though it would not fundamentally alter its PBV programs to permit family members to rent to each other as a disability accommodation; indeed, the cancelled 2016 Neighborhood Housing RFP contemplated this exact accommodation. *Id.* ¶¶ 62-63.

DHA initially justified this position by asserting, incorrectly, that HUD regulations did not permit it to offer such an accommodation. Compl. ¶ 64. When asked, HUD informed DHA that, in fact, no HUD regulation bars it from providing the accommodation. *Id.* ¶ 67.

Nonetheless, DHA has chosen to adhere to its refusal to offer PBVs that parents of adults with I/DDs can use to buy homes and lease them to their children. *Id.* ¶ 69. It has offered no other rationale for this position. *Id.*

DHA's cancellation of its 2016 Neighborhood Housing RFP and refusal to make necessary accommodations that permit adults with I/DDs to participate in any other of its PBV offerings has excluded those adults and their families from the benefits of its affordable housing programs. Compl. ¶ 70. As a result, the Individual Plaintiffs' adult children continue to live with them or otherwise are consigned to housing arrangements that are inferior in the present and less secure going forward. For example, Plaintiff Mary Hubbard's daughter Jessica uses a housing choice voucher to rent an apartment by herself with a caregiver. *Id.* ¶ 73. This leaves her lonely, without the regular peer interaction she would get through family-style living with others under the PBV program. *Id.* ¶ 74. Similarly, Plaintiff Cynthia Curtis's daughter Krystal now lives with her again, after a group-home experience proved unsatisfactory because group home staff had a high rate of turnover and did not have the training, patience, and other qualities necessary to work with adults with I/DDs. *Id.* ¶ 107. Each of the Individual Plaintiffs previously applied for the 2016 Neighborhood Housing RFP and/or is prepared to take advantage of the opportunity provided by a suitable PBV offering should DHA provide the accommodations necessary to let them control their children's living environment.

As described in greater detail below, each of the Plaintiffs has suffered concrete harm as a result. DHA's unlawful policy denies the Individual Plaintiffs the chance to attain better and secure housing opportunities for their children. Were it not for DHA's discriminatory acts, the Individual Plaintiffs would have the opportunity to secure for their children a more independent, more stable, and otherwise more desirable living situation. Compl. ¶¶ 20-24. Instead, most of the

Individual Plaintiffs' adult children with I/DDs continue to live with them, while the one who does not lives in unnecessary isolation. *Id.* ¶¶ 87, 89, 98, 103-104, 112. The Individual Plaintiffs experience deep anxiety and worry as to whether they will ever be able to secure suitable housing for their children, and fear that their children may ultimately be institutionalized or homeless. *Id.* ¶¶ 41, 100, 115. DHA's conduct also denies the Individual Plaintiffs the opportunity to obtain concrete personal benefit from the PBV program, for example by becoming participating landlords. *See, e.g.*, Compl. ¶¶ 14, 78-80 (Plaintiff Hubbard applied for PBV to rent to daughter Jessica and others), 88 (Plaintiff Shadduck would apply for PBV to rent to son and others if DHA provided option that included necessary accommodation), 97, 102-103. DHA's refusal to do so has deprived them "of PBV funds that would have covered a portion of their mortgages and other carrying costs of housing residents with I/DDs." *Id.* ¶ 14.

Plaintiff CPSH, meanwhile, is an organization devoted to creating exactly the sort of lasting, appropriate housing opportunities for adults with I/DDs at issue here, including through the use of PBVs. Compl. ¶¶ 19, 46, 116-117. DHA's refusal to offer accommodations that would make the PBV program usable for its constituents has frustrated CPSH's ability to carry out its mission and create such housing opportunities. *Id.* ¶¶ 116-117. In response, CPSH has had to divert scarce resources to counteracting the effects of DHA's conduct, *id.* ¶ 117, forcing it to forego other important projects it would have otherwise undertaken. *Id.* ¶ 118.

**ARGUMENT**

DHA's Motion arises under Federal Rule of Civil Procedure 12(b)(6). In ruling on the Motion, this Court "must 'accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Richardson v. Axion*

*Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015)). The Court must deny the Motion if the Complaint states a "plausible" claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). The facts alleged in a complaint "must 'be enough to raise a right to relief above the speculative level,' but the complaint may survive a motion to dismiss even if recovery seems 'very remote and unlikely.'" *Innova Hosp. San Antonio*, 892 F.3d at 726 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555-56 (2007)). Moreover, even a complaint that is "light on factual details" may "satisfy the low threshold of Rule 8." *Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 497-98 (5th Cir. 2015).

**A. Plaintiffs Have Standing.**

The Individual Plaintiffs—all of whom are the parents of adults with I/DDs, and all of whom want to partake in the benefits of DHA's PBV program in some way but are denied the opportunity to do so by DHA's policies—have standing to sue. DHA's Motion appears to rely on an improperly cramped conception of standing to challenge disability discrimination, which is not limited to suits brought by people with disabilities.

It is well-established that individuals without disabilities have standing to sue under the Fair Housing Act, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act when they are injured because of their association with people with disabilities. *See Chavez v. Aber*, 122 F. Supp. 3d 581, 592 (W.D. Tex. 2015) (parent of child with disability had standing under FHA where discrimination against child caused her out-of-pocket expenses and other injuries) (citing *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 544 (6th Cir. 2014)); *Doe v. Cty. of Centre, PA*, 242 F.3d 437, 447 (3d Cir. 2001) (under ADA and Section 504, standing extends to "persons who associate with persons with disabilities and who are discriminated against because of that association") (internal quotation marks and citation

omitted); *see also McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) (collecting cases). That is because the FHA, Title II, and Section 504 provide broad causes of action for *all* those harmed by disability discrimination, not just those with disabilities. *See* 42 U.S.C. § 3613(a)(1)(A) (right of action under FHA for any "aggrieved person"); 29 U.S.C. § 794a(a)(2) (right of action under Section 504 for "any person aggrieved"); 42 U.S.C. § 12133 (right of action under Title II for "any person alleging discrimination"); 42 U.S.C. § 12182(b)(1)(E). As courts have declared with respect to the Fair Housing Act, "Congress intended standing . . . to extend to the 'full limits' of Article III of the United States Constitution, and accordingly an FHA plaintiff need only allege a 'distinct and palpable injury' caused by the defendant's actions." *Hollis*, 760 F.3d at 544 (internal citation omitted). Accordingly, parents may be injured because of their children's disabilities in a variety of ways, so long as they suffer personal injury. *Chavez*, 122 F. Supp. 3d at 592.

Here, DHA's action directly denies parents the opportunity to seek PBVs that would be useful for their families; they would apply for or otherwise seek the benefits of PBVs, but are being preemptively denied such opportunity by DHA's blanket ban on making reasonable accommodations for their children's needs.[1] As the Fifth Circuit has explained, "[W]hen the plaintiff is himself an object of the action (or foregone action) at issue[,] there is ordinarily little question that the action or inaction has caused him injury." *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996) (internal quotation marks and citations omitted);

[1] This stated intention is backed up by concrete actions already taken. By the time DHA cancelled the program, Plaintiff Hubbard had submitted her application for a PBV, *id.* ¶¶ 77-78; Plaintiffs Waterman and Niemotka had taken affirmative steps to apply for a PBV, including researching the PBV and locating an appropriate house and roommates, *id.* ¶¶ 94-97, 102; and Plaintiffs Shadduck and Curtis had taken affirmative steps to situate their children in PBV-supported houses, *id.* ¶¶ 85-86, 109.

*see also, e.g.*, *Freyre v. Hillsborough Cty. Sheriff's Office*, No. 8:13-CV-02873-T-27, 2014 WL 6885913, at *5 (M.D. Fla. Dec. 5, 2014) (if parents are "personally denied benefits" due to the disability of their children, then they have standing to sue) (internal quotation marks and citation omitted). That is the situation here. The Individual Plaintiffs are not seeking to "enforce only their children's rights," DHA Br. at 8 (quoting *Hooker v. Dallas Indep. Sch. Dist.*, No. 3:09-cv-1289-D, 2010 WL 4025877, at *4 (N.D. Tex. Oct. 13, 2010)), but rather seek redress of harm to themselves.

Four of the Individual Plaintiffs would apply to be landlords under the PBV program should DHA institute a PBV offering suitable for their children. Thus, they are being denied not only the chance to obtain better and secure housing opportunities for their children, but also the opportunity to personally benefit economically from the PBV program. *See, e.g.*, Compl. ¶¶ 14, 78-80 (Plaintiff Hubbard applied for PBV to rent to daughter Jessica and others), 88 (Plaintiff Shadduck would apply for PBV to rent to son and others if DHA provided option that included necessary accommodation), 97, 102-103. DHA's refusal to do so has deprived them "of PBV funds that would have covered a portion of their mortgages and other carrying costs of housing residents with I/DDs." *Id.* ¶ 14. Plaintiff Curtis, meanwhile, would have secured paid employment as a live-in aide had DHA approved PBVs under the now-canceled 2016 Neighborhood Housing RFP, and so DHA's refusal to approve PBVs under that plan or any other suitable for her child concretely harms her economically as well. *Id.* ¶ 109. The Individual Plaintiffs thus have standing without showing they definitely would be awarded PBVs or otherwise benefit from them; it is sufficient that DHA's policy has deprived them of the opportunity to apply under terms that would make PBVs valuable to them. *See Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 292 (5th Cir. 2018) ("[A] plaintiff

suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity" (internal quotation marks omitted) (quoting *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) and *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989))).

In addition, parents have standing when they are personally harmed due to their children's inability to "attain independent living." *Ores v. Willow West Condo. Ass'n*, No. 94 C 4717, 1996 WL 111894, at *4 (N.D. Ill. Mar. 12, 1996); *see also, e.g., Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 161–62 (5th Cir. 2016) (parents had standing to bring ADA and Section 504 claims based on economic injury in the form of past and future medical expenses). This includes injury from parents' "lost peace of mind because of their [children's] inability to obtain housing," as well as out-of-pocket expenses incurred by parents as a result of their children's inability to live independently. *Ores*, 1996 WL 111894, at *2, *4*; see also Chavez*, 122 F. Supp. 3d at 592. Here, the Individual Plaintiffs allege precisely these types of injury.

Were it not for DHA's discriminatory acts, the Individual Plaintiffs would have the chance to secure for their children a more independent, more stable, and otherwise more desirable living situation. Compl. ¶¶ 20-24. Instead, all but one of their adult children with I/DDs continue to live with the Individual Plaintiffs. *Id.* ¶¶ 87, 89, 98, 103-104, 112. The Individual Plaintiffs experience deep anxiety and worry as to whether they will ever be able to secure suitable housing for their children, and fear that their children may ultimately be institutionalized or homeless without such housing. *Id.* ¶¶ 41, 100, 115. And far from alleging this in a "conclusory" way, as DHA asserts, the Complaint makes clear *why* any parent in the Individual Plaintiffs' shoes would experience such anxiety and worry. All of this constitutes harm giving

them standing.

DHA argues that the Individual Plaintiffs' claims should be dismissed "because they do not allege that they were discriminated against on the basis of a disability." DHA Br. at 8. But the Individual Plaintiffs plead that *they* (not just their children) have suffered concrete injuries as a result of DHA's disability discrimination. DHA also errs in arguing that the Individual Plaintiffs are not suffering "actual or imminent injury" because they each have "a workable solution to their adult children's current housing needs." *Id.* at 9. The Individual Plaintiffs allege concrete harm that they are suffering *right now* because DHA's policies prevent them from transitioning their adult children to more independent, stable, and otherwise suitable living arrangements. As the Complaint alleges in detail, DHA's challenged policy both prevents them from structuring their children's current living situations to meet present needs and prevents them from arranging for their children's future needs, causing them immense anxiety. That their children are not currently homeless does not defeat their standing.[2]

The organizational Plaintiff, CPSH, also has standing. An organization has standing to challenge conduct that "perceptibly impair[s]" its ability to carry out its purpose. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 611 (5th Cir. 2017) (internal quotation marks and citation omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) ("Congress intended standing under [the FHA] to extend to the full limits of Art. III"). CPSH is a non-profit organization dedicated to working with families, the government, service providers, and community partners to create safe, affordable housing for adults with I/DDs in North Texas.

---

[2] DHA suggests that the fact that Plaintiff Hubbard's daughter has another type of voucher "clearly negates any claim of an actual or imminent injury." DHA Br. at 9. But DHA completely ignores Plaintiffs' allegations regarding the inadequacies of Ms. Hubbard's daughter's current housing set-up, which isolates her from peers with I/DDs, and the harmful effects that Plaintiff Hubbard in turn experiences. *See* Compl. ¶¶ 73-76.

Compl. ¶¶ 19, 46. In furtherance of its mission, CPSH has devoted significant resources to facilitating the use of the PBV program to help adults with I/DDs, including, *inter alia*, collaborating with potential partners and promoting the program to thousands of families across North Texas. *Id.* ¶¶ 116-117. In response to DHA's refusal to offer accommodations that would make the PBV program usable for its constituents, CPSH has had to divert scarce resources to counteracting the effects of DHA's conduct, such as by counseling affected parents and caregivers about the cancellation of the 2016 Neighborhood Housing RFP; providing guidance to caretakers as to how to ameliorate losses; and addressing the cancellation with DHA via meetings and letters. *Id.* ¶ 117. In order to undertake these activities, CPSH was forced to forego other important projects it would have otherwise undertaken, including creating additional programming and increasing its advocacy around in-home care provision. *Id.* ¶ 118. CPSH's allegations of frustration of mission and resulting diversion of resources more than suffice to "follow[] the Fifth Circuit's formula for establishing standing" for an organizational plaintiff. *Steward v. Abbott*, 189 F. Supp. 3d 620, 631 (W.D. Tex. 2016) (internal quotation marks and citation omitted); *see, e.g.*, *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788 (W.D. Tex. 2015).

DHA incorrectly asserts that CPSH lacks standing because it does not allege that it (as opposed to its constituents) was "discriminated against on the basis of a disability." DHA Br. at 8. Standing requires only that the Plaintiffs be harmed by the Defendant's discriminatory practice, not that they be its direct target. For example, in *OCA*, an organization had standing to challenge a voting restriction that discriminated based on race (and thereby affected its ability to carry out its mission in the requisite manner), notwithstanding that the restriction did not discriminate against the *organization* based on race. 867 F.3d at 610. For similar reasons, DHA

errs in highlighting the fact that CPSH itself (as opposed to some of the families it serves) "never submitted a response to DHA's RFP." DHA Br. at 8. CPSH does not claim that *it* wants to participate in the PBV program; it claims that people it serves do, and that their exclusion harms its ability to carry out activities that further its mission. *See*, *e.g.*, *Avalon Residential Care Homes, Inc. v. City of Dallas*, No. 3:11-CV-1239-D, 2011 WL 4359940, at *3-*4 (N.D. Tex. Sept. 19, 2011) (plaintiff non-profit group housing provider had standing to bring FHA challenge to action that discriminated against its residents on the basis of disability, and in the process harmed the provider).

Finally, DHA argues that Plaintiffs have "failed to plead sufficient facts to establish that DHA cancelled the RFP in question," noting that "DHA has specific procedures for cancelling RFPs" that Plaintiffs' Complaint did not discuss. DHA Br. at 8. But Plaintiffs have specifically alleged that DHA cancelled the 2016 Neighborhood Housing RFP, with allegations including the date of cancellation, the communication of the cancellation to Plaintiffs, and the putative reason for cancellation. *See* Compl. ¶¶ 60-61. For purposes of standing analysis, Plaintiffs' allegations must be taken as true and the Court must presume that Plaintiffs would succeed on their claims on the merits. *See Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015) (internal citation omitted). DHA cannot point to any authority suggesting that Plaintiffs must reconcile the cancellation with DHA's standard protocol in order to survive a motion to dismiss for lack of standing. In any event, the harm Plaintiffs have experienced and continue to experience—exclusion from the benefits of DHA's PBV programs—does not turn on whether DHA characterizes what happened with one RFP as a "cancellation" as opposed to something else.

### B. Plaintiffs Allege Facts That State a Claim Under Multiple Theories.

DHA similarly errs in arguing that Plaintiffs fail to state a claim. Plaintiffs allege that DHA has a policy of refusing to permit those participating in the PBV program to rent to family members. It will not deviate from this policy to accommodate the needs of people with disabilities, even though it could reasonably do so without fundamentally altering its programs. DHA's policy has the effect of excluding people with I/DDs and their families from the PBV program's benefits and preventing people with I/DDs from securing housing that allows them to live in the most community-integrated setting suitable to their needs.

DHA thus violates Title II, Section 504, and the Fair Housing Act. As DHA does not dispute, those laws require DHA—a public entity that receives federal funding and provides housing benefits—to ensure that people with disabilities get the benefits of its services, that they are not denied housing that is available to others, and that they can receive housing in the most community-integrated settings appropriate for their needs. They collectively bar practices, like the one challenged here, that exclude people with disabilities from the full range of benefits that DHA confers on others. *See, e.g., Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (right not to be excluded from benefits of sidewalk services); *Falls v. Bd. of Comm'rs of New Orleans Reg'l Transit Auth.*, No. CV 16-2499, 2017 WL 2730781, at *3-*4 (E.D. La. June 26, 2017) (right not to be excluded from inaccessible bus stops); *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 755 (N.D. Tex. 2014) (right not to be excluded from designated parking); *Jordan v. Greater Dayton Premier Mgmt.*, 9 F. Supp. 3d 847, 859 (S.D. Ohio 2014) (right not to be excluded from full benefits of Section 8 housing voucher program);[3]

[3] *See also Van Velzor*, 43 F. Supp. 3d at 760 (N.D. Tex. 2014) (right to equal enforcement of disability-related parking and traffic laws); *Chadam v. Palo Alto Unified Sch. Dist.*, 666 F.

In particular, all three laws require public housing authorities to, where necessary, make reasonable modifications to their policies to ensure that individuals with disabilities get the benefit of their housing programs. *See, e.g.*, 28 C.F.R. § 35.130(b)(7); 24 C.F.R. § 8.33; 42 U.S.C. § 3604(f)(3)(B); *see also* Compl. ¶¶ 29-37 (setting out legal framework); *Green v. Hous. Auth. of Clackamas Cty.*, 994 F. Supp. 1253, 1256 (D. Or. 1998) (under all three laws, "a modification to a rule *must* be made unless it causes some undue burden"; public housing authority required to modify blanket "no pets" policy that excluded people with disabilities from public housing benefits); *Huyn v. Sanchez*, No. 5:14-cv-02367 LHK, 2014 WL 4364846, at *4-*7, *9-*11 (N.D. Cal. Sept. 2, 2014) (liability under all three laws where PHA failed to afford plaintiff housing opportunities equal to those afforded other Section 8 voucher holders, limited his benefits based on disability, and refused to make reasonable accommodations). Plaintiffs thus state claims against DHA under all three federal civil rights laws, as well as the Texas Fair Housing Act.[4]

The 168-paragraph Complaint lays all of this out in detail. DHA can only call Plaintiffs' allegations "conclusory" and "unsupported" because it misunderstands the thrust of Plaintiffs' claims. DHA Br. at 11. Plaintiffs do not contend that DHA discriminated against people with I/DDs "by not accepting their proposals and not awarding Section 8 payment contracts." *Id.* Rather, they contend that DHA discriminates by refusing to offer reasonable modifications to its rigid refusal to permit PBV program participants to rent to family members even where

App'x 615, 617 (9th Cir. 2016) (right not to be excluded from benefit of policy establishing a right to attend neighborhood school).

[4] DHA does not make separate arguments supporting its motion to dismiss the state-law claim, and so that claim is not further discussed in this response. *See* DHA Br. at 14; *see also Chavez*, 122 F. Supp. 3d at 601 (W.D. Tex. 2015) (Texas Fair Housing Act provides substantially equivalent rights and remedies to federal law).

necessary to permit individuals with disabilities and their families to enjoy the benefits of DHA's PBV offerings. Regarding this policy, which is what Plaintiffs actually challenge, DHA asserts that Plaintiffs' allegations that it exists are "vague and conclusory." DHA Br. at 14. This ignores the Complaint's allegations that DHA specifically informed CPSH that it had such a policy, Compl. ¶ 61; that DHA told CPSH that the policy was based on its (erroneous) interpretation of HUD regulations, *id.* ¶¶ 64-66; and that DHA adhered to this policy even after conferring with HUD and receiving the correct interpretation, *id.* ¶¶ 67-69. DHA does not explain why this is insufficient; it just ignores these allegations in its Motion.

DHA offers several other arguments in support of its Motion. All are meritless.

First, DHA argues that Plaintiffs must allege that they (as opposed to their children, in the case of the Individual Plaintiffs, or their constituents, in the case of CPSH) have a qualifying disability.[5] DHA Br. at 9. This is incorrect for the reasons described above. DHA's citation to *Hale v. King*, 642 F.3d 492 (5th Cir. 2011), is inapposite, because in that case the plaintiff alleged discrimination *against himself*, making it necessary that *he* have the qualifying disability. Nothing in *Hale* purports to contradict the established rule, described above, that challenges to disability discrimination can be brought by plaintiffs who do not themselves have a disability so long as they are concretely harmed by the discriminatory conduct. Indeed, DHA's own brief cites to *Dallas Indep. Sch. Dist.*, 2010 WL 4025877, at *4, which held that a defendant's retaliatory acts against parents after they asserted their disabled child's rights conferred standing.

Second, DHA contends that its policy of refusing to permit PBV participants to rent to family members, even where necessary to accommodate the needs of people with disabilities,

---

[5] DHA does not dispute that the adults with I/DDs described in the Complaint have qualifying disabilities.

does not deprive people with I/DDs and their families of the housing options that others receive from the PBV program.[6] *See* DHA Br. at 9 (arguing none of the Plaintiffs have been "denied the benefits of services, programs, or activities for which DHA is responsible"). But the Complaint alleges otherwise, and any factual dispute about whether it does so correctly cannot be resolved on this Motion. *Huynh v. Sanchez*, 2014 WL 4364846, at *9 ("whether Huynh received 'meaningful access' to the housing benefits that other non-disabled people received is a factual question not appropriate for resolution at this stage). Moreover, DHA ignores the Complaint's detailed allegations as to *how* its policy has such exclusionary effects. As laid out more fully above, *see supra* pp. 4-5, the Complaint alleges that the Individual Plaintiffs cannot provide their children with the supports they require to live independently within the context of an arm's-length landlord-tenant relationship. Thus, DHA's refusal to permit family rental of PBV properties under any circumstances effectively precludes adults with I/DDs and their families from participating in any of DHA's PBV offerings. Indeed, DHA itself recognized the importance of family ownership to confer all these benefits in the now-cancelled 2016 Neighborhood Housing RFP, Compl. ¶ 62, while HUD regulations, for similar reasons, permit family ownership as an accommodation for the needs of people with disabilities. *Id.* ¶ 65. To the extent DHA means to suggest that federal law does not bar it from making its PBV offerings accessible to individuals with I/DDs, it is mistaken, since such exclusion from community-based housing by unbending administrative procedures is a well-established form of disability discrimination. "Segregation from community-based services is not cured by the fact that the community-based services exist; the existence of such services means nothing to individuals who

[6] DHA also denies that it has such a practice but properly does not ask this Court to give that denial any weight on a motion to dismiss. DHA Br. at 10.

are excluded from them." *Steward*, 189 F. Supp. 3d at 633 (W.D. Tex. 2016).

For similar reasons, DHA errs in arguing that Plaintiffs do not sufficiently allege that DHA's challenged policies make housing unavailable to people with disabilities. DHA Br. at 13. In fact, Plaintiffs allege that certain single-family homes would be available to Plaintiffs and their adult children but for DHA's unlawful policies. Compl. ¶¶ 69-70. It is immaterial that one of the Individual Plaintiffs' adult children (Mary Hubbard's daughter Jessica) is receiving other, less suitable housing through a different DHA voucher program, DHA Br. at 13; Plaintiffs need not allege exclusion from *all* housing opportunities, and they allege that Jessica's current arrangement leaves her isolated and lonely, with few opportunities for socialization. Compl. ¶¶ 73-74. Individuals with disabilities are entitled to policy modifications that provide them with *equal* enjoyment of DHA's programs, rather than being relegated to offerings that do not fully meet their needs. *See, e.g.*, 42 U.S.C. § 3604(f)(3)(B) (unlawful discrimination under Fair Housing Act includes failure to make reasonable accommodations that are "necessary to afford such person *equal opportunity to use and enjoy a dwelling*") (emphasis added).

Third, DHA erroneously suggests that Plaintiffs' claims depend on a showing that "any actions by DHA were taken 'with the intent of making housing unavailable.'" DHA Br. at 13. Discriminatory intent is not required to make out a claim under any of the laws at issue here. *See, e.g.*, *Shaikh v. Texas A&M Univ. Coll. of Med.*, No. 16-20793, 2018 WL 3090415, at *7 (5th Cir. June 20, 2018) ("Section 504's prohibitions are not confined to animus-based discrimination") (internal quotation marks and citation omitted); *Inclusive Cmtys. Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 860 F. Supp. 2d 312, 323 n. 19 (N.D. Tex. 2012) (proof of discriminatory intent not required to demonstrate violation of Fair Housing Act). A species of discriminatory intent must be shown to win damages under the ADA and Section 504, but not the intent that

DHA suggests; rather, the necessary intent "may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . [or] custom." *Falls*, 2017 WL 2730781, at *6 (internal quotation marks and citation omitted). That is exactly what Plaintiffs allege here. DHA knows that the accommodation that Plaintiffs seek is necessary for adults with I/DDs to enjoy the benefits of its PBV programs, and that they will be excluded from its program otherwise, Compl. ¶ 61; it was specifically told by HUD that HUD regulations do not bar it from offering this accommodation, *Id.* ¶ 67; and yet it persists in refusing to offer such an accommodation, without ever proffering a legitimate reason. *See id.* ¶ 69.

Fourth, DHA suggests that the accommodation Plaintiffs seek (a waiver of DHA's absolute bar on PBV participants' renting to family members) is unreasonable as a matter of law because it is beyond DHA's authority to grant.[7] DHA Br. at 12-13. Its arguments are based on a misreading of Plaintiffs' allegations, the relief Plaintiffs seek, and its own authority.

DHA contends the RFP it cancelled may not have been legally permissible because it set aside PBVs only for individuals with I/DDs, as opposed to individuals with disabilities more broadly. DHA Br. at 12-13; *see also id.* at 3-4. As an initial matter, the Complaint does not allege that DHA cancelled the 2016 Neighborhood Housing RFP for this reason, making it irrelevant on a motion to dismiss whether DHA *could* properly have done so. In any event, this argument is based on the incorrect premise that Plaintiffs seek a reinstated "RFP solely for the benefit of individuals with I/DDs." *Id.* at 12. What Plaintiffs actually ask for in this lawsuit is that DHA give individuals with I/DDs and their families (as well as others with disabilities that require

[7] Any argument that such an accommodation is unreasonable as a matter of fact would be inappropriate at the motion to dismiss stage, and DHA does not appear to make any such argument.

similar accommodations) the benefit of future RFPs by permitting parents to lease to their adult children where necessary to accommodate disability. Granting this relief does not require DHA to offer RFPs solely for the benefit of individuals with I/DDs, nor does it require DHA to retroactively accept proposals submitted in connection with past RFPs, as DHA wrongly suggests. *See id.*

DHA also suggests that it is unclear whether HUD regulations permit it to offer this accommodation. *See* DHA Br. at 2-4. There is no basis for this position, as HUD has made clear to DHA. The HUD regulation governing DHA's approval of renters for the PBV program states: "A PHA may not approve a tenancy if the owner (including a principal or other interested party) of a unit is the parent, child, grandparent, grandchild, sister, or brother of any member of the family, *unless the PHA determines that approving the unit would provide reasonable accommodation for a family member who is a person with disabilities*." 24 C.F.R. § 983.251(a)(4) (emphasis added). The regulation thus makes clear that a PHA can provide this accommodation for a disability, and HUD has confirmed this to DHA. Compl. ¶ 67-69. DHA does not contend that offering this modification to those who need it would otherwise fundamentally alter DHA's program or be unreasonable.

Thus, despite its attempt to muddy the waters as to this point, DHA is making the entirely voluntary decision to deny people with I/DDs and their families this accommodation, though it knows full well the accommodation is necessary for them to enjoy the benefits of DHA's programs and live independently in community settings. It still has provided no legitimate reason for doing so. This easily states a claim for disability discrimination under all three laws.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated: October 17, 2018

Respectfully submitted,

/s/ Glenn Schlactus
Glenn Schlactus*
Sasha Samberg-Champion*
Sara Pratt*
Yiyang Wu*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
Fax: (202) 728-0848
gschlactus@relmanlaw.com
ssamberg-champion@relmanlaw.com
spratt@relmanlaw.com
ywu@relmanlaw.com

/s/ Rachel B. Cohen-Miller
Rachel B. Cohen-Miller
State Bar No. 24064301
Christopher P. McGreal
State Bar No. 24051774
DISABILITY RIGHTS TEXAS
1420 Mockingbird Lane, Suite 450
Dallas, Texas 75247
(214) 845-4069 (Phone)
(214) 845-4056 (Phone)
(214) 630-3472 (Fax)
rmiller@drtx.org
cmcgreal@drtx.org

* Admitted pro hac vice

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss was filed on this 17th day of October, 2018, using the Court's CM/ECF system, and served according to law on the following counsel for Defendant via same:

Gerald Bright
David Craft
WALKER BRIGHT PC
100 North Central Expressway, Suite 800
Richardson, Texas 75080
Telephone: (972) 744-0192
Telecopier: (972) 744-0067
Email: gerald.bright@wblpc.com

*Counsel for Housing Authority of the City of Dallas, Texas*

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion

Counsel for Plaintiffs