IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| COMMUNITY FOR PERMANENT SUPPORTED HOUSING, CYNTHIA CURTIS, MARY HUBBARD, IRENE NIEMOTKA, MARGARET ("PEGGY") SHADDUCK, and KELLY WATERMAN, | § § § § § § § | |
|---|---|---|
| Plaintiffs, | § § | Civil Action No. 3:18-CV-2030-K |
| v. | § § | |
| HOUSING AUTHORITY OF THE CITY OF DALLAS, TEXAS, | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Housing Authority of the City of Dallas, Texas' Motion to Dismiss Pursuant to Rule 12(b)(6) and Brief in Support (the "Motion") (Doc. No. 19). The Court has considered the Motion, brief in support, response, reply, and applicable law. Because the Plaintiffs' claims are not yet ripe for judicial review, the Court **GRANTS** the Motion and **DISMISSES without prejudice** all of the Plaintiffs' claims within their Complaint (Doc. No. 1).

I.  **Factual and Procedural Background**

The dispute at the center of this case involves a purported policy of Defendant Housing Authority of the City of Dallas, Texas ("DHA") regarding the availability of a

1

certain type of Section 8 housing voucher for individuals with intellectual and developmental disabilities ("I/DDs"). Plaintiffs Cynthia Curtis, Mary Hubbard, Irene Niemotka, Margaret ("Peggy") Shadduck, and Kelly Waterman (collectively, the "Individual Plaintiffs") are all mothers of adult children with I/DDs. Each of the Individual Plaintiffs desire a housing situation for their respective children that would allow these adult children to live more independently from their parents. More specifically, the Individual Plaintiffs would prefer a housing situation in which their children live in single-family homes with other individuals with similar I/DDs. These households would have a live-in aide who would help support the three or more residents with I/DDs.

To provide and maintain a single-family home for adults with I/DDs, the Individual Plaintiffs would need some form of financial assistance. Project-based vouchers ("PBVs") are one form of financial assistance that the Individual Plaintiffs considered. PBVs are a subset of "Section 8" housing vouchers. Whereas the more commonly known Section 8 housing vouchers provide subsidies to individuals that qualify for them, PBVs "attach" to specific properties. Owners of properties that qualify for PBVs can then in turn rent the property to qualifying individuals at a lower rate.

Recognizing the benefit of PBVs for parents in situations similar to the situations of the Individual Plaintiffs, Plaintiff Community for Permanent Supported Housing ("CPSH") began working with DHA in 2012 in an effort to convince DHA to provide

2

PBVs for properties tailored for individuals with I/DDs. In July 2016, at CPSH's urging, DHA initiated a pilot program that would make available up to 50 PBVs for single-family homes that would house three or more individuals with I/DDs, as well as a live-in aide. DHA began this pilot program through a "request for proposals" ("RFP"), through which property owners and potential property owners could submit applications to receive a PBV for a property that satisfied the necessary requirements.

An important aspect of this RFP was that in DHA's marketing of the RFP, DHA stated that a parent of an adult child with an I/DD could be the owner (and thus the landlord) of a property in which one of the residents was his or her adult child. Federal regulations generally prohibit such an arrangement, but DHA took the position that allowing such an arrangement for this RFP would be permissible as a "reasonable accommodation" to the general rule. *See* 24 C.F.R. § 983.251(a)(4) (2018). DHA took this position in an addendum to its RFP that it published in September 2016, and DHA also relayed this position at an informational meeting organized by CPSH.

The parties dispute many of the following facts, but, because of the procedural posture of this case, the Court adopts the facts as pleaded in the Complaint. Early in 2017, prior to taking any action on an application for a PBV made in the RFP, DHA decided to cancel the pilot program that would provide up to 50 PBVs for properties housing individuals with I/DDs. DHA communicated this decision to CPSH in April 2017. In its communications to CPSH, DHA stated that it decided to cancel the pilot

3

program because of guidance it received from the United States Department of Housing and Urban Development ("HUD") regarding the effect of the regulations that generally prohibit parents from renting a PBV-subsidized property to their children. In HUD's guidance letter to DHA, which the Plaintiffs quote in their Complaint and DHA appends as an exhibit to its reply, HUD explains that a family-owned, PBV-subsidized property may be permissible as an exception to the general rule prohibiting such an arrangement under the theory that such an arrangement may be a "reasonable accommodation." In this same guidance letter, HUD noted that there might be potential for concern in DHA's RFP if the RFP purported to limit the applicant pool to individuals with certain types of disabilities and excluded individuals with other disabilities that would otherwise qualify for housing assistance.

After DHA received this guidance letter, the Plaintiffs allege that DHA took two actions. First, as explained above, DHA cancelled the PBV pilot program that might have allowed the Individual Plaintiffs an opportunity to obtain a PBV for a property that would house their children. Prior to the cancellation of the pilot program, Plaintiff Mary Hubbard had submitted an application for a PBV, while the other Individual Plaintiffs had taken "affirmative steps" in anticipation of applying for a PBV. Second, DHA "effectively adopted [a] blanket ban" prohibiting PBV housing arrangements in which the parent was the owner of a single-family home where the adult child with an

I/DD resided. This second alleged action by DHA forms the basis of the Plaintiffs' claims.

DHA styles its Motion as one based upon Federal Rule of Civil Procedure 12(b)(6), but DHA's arguments stem from two separate theories. First, DHA argues that neither CPSH nor the Individual Plaintiffs have standing to bring their claims. Second, DHA argues that the Plaintiffs fail to state a claim under any of the statutes on which they based the claims in their Complaint. Because the Court's analysis in this Order focuses on issues of standing and ripeness, the Court does not address DHA's second theory in its Motion.

In response to DHA's arguments regarding the Plaintiffs' standing, the Plaintiffs emphasize that DHA misunderstands the nature of the Plaintiffs' claims. Rather than base their Complaint solely on DHA's discontinuance of the PBV pilot program, the Plaintiffs base their claims on DHA's purported blanket ban prohibiting family-owned, PBV-subsidized properties for adult children with I/DDs. In other words, the Plaintiffs are not suing for reinstatement of the PBV pilot program or for the approval of any specific PBV application; the Plaintiffs instead are challenging DHA's *per se* rule prohibiting family-owned, PBV-subsidized properties even when such an arrangement might qualify as a "reasonable accommodation." Understanding the Complaint in this manner, the Plaintiffs argue that the Individual Plaintiffs have standing because they are prohibited from ever benefitting from a PBV voucher. The Plaintiffs also argue that

CPSH has standing because CPSH devoted time and resources in advertising the pilot program and educating interested individuals, like the Individual Plaintiffs, about how the PBVs would operate, and DHA injured CPSH by effectively discontinuing the pilot program through adopting a blanket ban prohibiting family-owned, PBV-subsidized properties.

## II. Applicable Law

"The oft-repeated requirements of Article III standing are that the plaintiff '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 291 (5th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). A district court may dismiss a case for lack of standing "on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017) (quoting *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). A district court should dismiss a case for lack of constitutional standing under Rule 12(b)(1). *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011). The district court may raise the issue of constitutional standing *sua sponte* at any time. *See id.*; FED. R. CIV. P. 12(h)(3).

"The justiciability doctrines of ripeness and standing often intersect . . . ." *Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee Cty., Miss.*, 205 F.3d 265, 268 n.7 (5th Cir. 2000). "Nonetheless, ripeness and standing serve separate and distinct purposes, and it is possible for claim [sic] to be unripe despite the existence of standing to raise that claim." *Roman Catholic Diocese of Dall. v. Sebelius*, 927 F. Supp. 2d 406, 423 (N.D. Tex. 2013) (Boyle, J.). "In general terms, standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time." *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). A case that is not ripe is a case that "will be better decided later," not necessarily a case that lacks standing. *See Roman Catholic Diocese of Dall.*, 927 F. Supp. 2d. at 424 (quoting *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003)). Cases that are not ripe are often too abstract or hypothetical for judicial resolution. *Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012). Similar to when a district court addresses issues of standing and subject-matter jurisdiction, a district court may consider issues of ripeness *sua sponte*, even if the ripeness issue is more of a prudential concern than a constitutional concern. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

When reviewing whether a case is ripe, the district court must "evaluate (1) the *fitness* of the issues for judicial decision and (2) the *hardship* to the parties of withholding court consideration." *Id.* (emphases added); *see also Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000) (holding that a case fit for judicial review is only

7

ripe when "the plaintiff . . . show[s] some hardship" as well). In the context of cases challenging administrative actions, a case is fit for judicial review when "(1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Texas*, 497 F.3d at 498–99 (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812). "[H]ardship [may] inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'" *Id.* at 499 (quoting *Oh. Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)). The doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and the doctrine also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

### III. Analysis

DHA does not originally address ripeness in its Motion, but, because of the Plaintiffs' response, DHA does make a brief reference to the issue of ripeness in its reply. A district court usually will not consider an issue raised for the first time in a

party's reply brief. *See Xtria LLC v. Tracking Sys., Inc.*, Civ. Action No. 3:07-CV-0160-D, 2007 WL 2719884, at *4 (N.D. Tex. Sept. 18, 2007) (Fitzwater, J.). However, the Court may consider an issue of ripeness *sua sponte*, so even if DHA did not extensively, or even properly, raise the issue through its briefing, the Court finds it proper to consider the issue in this case, especially in light of the parties' related arguments concerning standing. *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 809; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) (explaining that it was appropriate for the Supreme Court to consider the issue of ripeness despite it not being "explicitly addressed in the questions presented in the . . . petition" and that a court "cannot be bound by the wishes of the parties" regarding whether to address the issue of ripeness (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974))).

The Plaintiffs' argument for why both CPSH and the Individual Plaintiffs have standing in turn demonstrates why the claims that the Plaintiffs allege are not yet ripe for consideration by this Court. A "blanket ban" on family-owned, PBV-subsidized properties, even when such an arrangement might qualify as a reasonable accommodation, would create an injury-in-fact sufficient for the first prong of constitutional standing. Such a ban would be "particularized" as to the Individual Plaintiffs, as the ban would "affect the [Individual Plaintiffs] in a personal and individual way." *Spokeo, Inc.*, 136 S. Ct. at 1548. Such a ban would also be "concrete," as it would deprive adult children with I/DDs and their parents benefits that they might

9

otherwise receive. *Id.* at 1548–49. CPSH would also suffer an injury-in-fact from the alleged blanket ban, as CPSH committed time and resources to (1) lobby DHA for a policy or program that would allow family-owned, PBV-subsidized properties and (2) educate the public about the pilot program. *See OCA–Greater Hous. v. Texas*, 867 F.3d 604, 610–12 (5th Cir. 2017) (explaining that an organization suffered an injury-in-fact when it spent time and resources to educate the public about the effect of a law and did not claim that its injury stemmed solely from prelitigation expenses).

This alleged blanket ban therefore might serve as the basis for the Plaintiffs' standing, but the facts before this Court present a situation not yet ripe for judicial review. DHA's alleged actions in instituting a blanket ban prohibiting family-owned, PBV-subsidized properties are not yet "fit" for review: (1) the issues are not purely legal, as "reasonable accommodation" determinations are necessarily fact-specific; (2) DHA has yet to take "final agency action" in implementing this blanket ban, as CPSH asserts it only learned about the blanket ban through its communications with DHA in April 2017; and (3) "further factual development" regarding how this blanket ban is affecting persons like the Individual Plaintiffs would assist this Court in determining the legal issues presented in this case. *See Texas*, 497 F.3d at 498–99. Administrative action typically is not ripe "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, *by some concrete action applying the regulation to the claimant's situation* in a fashion that harms or threatens to

harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (emphasis added). Only one of the Individual Plaintiffs has actually applied for a PBV, and although DHA will not consider her application under the parameters of the pilot program anymore, DHA has not yet denied her application because of the alleged blanket ban prohibiting family-owned, PBV-subsidized properties. Until DHA formalizes this alleged blanket ban by making it DHA's official policy, and until the Individual Plaintiffs each suffer an injury because DHA denies their applications pursuant to the blanket ban, the case as pleaded by the Plaintiffs is not yet ripe. *See Texas*, 497 F.3d at 496 (explaining that the plaintiff may have been the type of individual with standing, but that because of the timing of the case, the plaintiff's claims were not yet ripe); *Roman Catholic Diocese of Dall.*, 927 F. Supp. 2d. at 424 (explaining that a case that is not yet ripe is a case that "will be better decided later" (quoting *Simmonds*, 326 F.3d at 357)). If the Court intervened at this point in time, the Court risks stepping into an abstract dispute between the parties and interfering with DHA's operations before DHA even implements a policy. *See Abbott Labs.*, 387 U.S. at 148–49. The alleged blanket ban against family-owned, PBV-subsidized properties may present a particularized and concrete injury for the Individual Plaintiffs (as well as CPSH); however, until DHA formally adopts this blanket ban and applies the ban by denying applications for family-owned, PBV-subsidized properties as a matter of course, this specific dispute is not yet ripe.

In summary, the Plaintiffs' pleaded claims in their Complaint will be deficient for one of two reasons because, at this point in time, the Plaintiffs cannot plead claims for both CPSH and the Individual Plaintiffs that would satisfy the requirements of standing and ripeness. If the Plaintiffs had based their claims on the alleged termination of the pilot program, then the Individual Plaintiffs would not have standing because DHA could still potentially approve their individual applications under a different program as "reasonable accommodations." If the Plaintiffs based their claims on the alleged blanket ban prohibiting family-owned, PBV-subsidized properties in all situations, as the Plaintiffs in fact do in their Complaint, then all the Plaintiffs fail to satisfy the ripeness requirement because this blanket ban has not been formalized or even materialized in the form of a rejection of a PBV application for any of the Individual Plaintiffs. On the theory upon which the Individual Plaintiffs presently base their Complaint, the Individual Plaintiffs' claims will not be ripe until DHA denies one of their applications for a PBV.

## IV. Conclusion

Because the Plaintiffs' claims present a dispute that is not yet ripe for judicial review, the Court will not exercise jurisdiction over this case. The Court therefore **GRANTS** the Motion, and the Plaintiffs' claims are **DISMISSED without prejudice**.

**SO ORDERED.**

Signed April 2nd, 2019.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE